UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Fawzi Zaya,

                        Petitioner,

                                        Case No. 20-10921

v.

                                        Judith E. Levy
Rebecca Adducci, *et al.*,               United States District Judge

                                        Mag. Judge Anthony P. Patti
                        Respondents.

_____/

## OPINION AND ORDER EXTENDING TEMPORARY RESTRAINING ORDER [9]

On April 18, 2020, the Court issued an order granting a temporary restraining order and requiring Petitioner Fawzi Zaya's immediate release from Immigration and Customs Enforcement (ICE) Custody. (ECF No. 9.) The TRO is set to expire on April 30, 2020, at 6:30pm EST. (*Id.* at PageID.679.) The Court ordered Respondent Adducci[1] to show

---

[1] Petitioner initially named as Respondents: Rebecca Adducci, the Detroit District Director of United States Immigration and Customs Enforcement; Matthew Albence, Deputy Director of ICE; Kevin McAleenan, Secretary of the United States Department of Homeland Security; and William Barr, Attorney General of the United States. In its April 18, 2020 Order, the Court found that it had jurisdiction under 28 U.S.C. § 2241. (ECF No. 9, PageID.665.) Only Respondent Adducci is a proper respondent for Petitioner's petition for habeas corpus. (*Id.*)

cause why the TRO should not be converted to a preliminary injunction. (*Id.*) On April 23, 2020, Respondent filed a response to the Court's order to show cause. (ECF No. 10.) On April 19, 2020, Petitioner filed his reply.[2] (ECF No. 11.) The Court now extends the TRO by fourteen days, during which time Respondent must show cause as to whether certain additional precautionary measures are feasible and in place.

## I.   Factual Background

Petitioner Fawzi Zaya is a forty-two-year-old citizen of Iraq. (ECF No. 7-1, PageID.509.) He has lived in the United States since March 1982. (ECF No. 1, PageID.21.) On December 19, 1997, Petitioner was convicted of Delivery over 50 Grams of Cocaine. (ECF No. 7-1, PageID.509.) Petitioner has also been convicted of domestic violence. (ECF No. 10, PageID.684.) On January 17, 2008, Petitioner was convicted of Second-Degree Murder. (ECF No. 7-1, PageID.509.) Upon Petitioner's parole from the Michigan Department of Corrections, ICE took him into custody

---

[2] Despite having six days in which to prepare a reply to Respondent's well-drafted and thorough twenty-seven-page response and accompanying exhibits, Petitioner filed a three-and-a-half-page reply in which he cites no legal authority. (ECF No. 11.) Given the significance of the issues presented by this case and the seriousness of Petitioner's constitutional claims, particularly as they relate to the high risk to Petitioner's health and life, the Court did not find this reply helpful to its consideration of his claims.

pursuant to 8 U.S.C. § 1231(a)(2). (*Id.*) Petitioner has been detained at the Calhoun County Correctional Facility (CCCF) since March 24, 2020. (*Id.*)

Petitioner has a number of serious health conditions which place him at increased risk of serious complication or death from a COVID-19 infection. Petitioner is obese. (ECF No. 10, PageID.685.) He suffers from high blood pressure, diabetes, asthma, and neurological problems. (ECF No. 2-2, PageID.247.) He also suffers from neural foraminal stenosis, a kind of spinal stenosis requiring the use of a wheelchair and a TENS (transcutaneous electrical nerve stimulation) unit. (*Id.*) Petitioner also has gout. (*Id.*) Respondent alleges that Petitioner has exaggerated his health conditions. (ECF No. 10, PageID.685.) But Respondent does not contest that Petitioner is obese and suffers from high blood pressure, diabetes, and asthma, each of which places him at heightened risk of severe illness and/or death from COVID-19. (*Id.*)

On April 13, 2020, Petitioner filed both a Petition for Writ of Habeas Corpus (ECF No. 1) and an Emergency Motion for Temporary Restraining Order (ECF No. 2.) The case was assigned to the Honorable Bernard A. Friedman. On April 13, 2020, the undersigned accepted

3

reassignment of this case as a companion to Case No. 20-10829, *Malam v. Adducci*. Both cases involve Petitioners with serious underlying health conditions challenging on Fifth Amendment grounds their continued confinement at the Calhoun County Correctional Facility in light of the risks posed by the COVID-19 pandemic. The Court granted Petitioner's motion on April 18, 2020. (ECF No. 9.)

Because the Court finds that combined with the current increased precautions, some additional measures may be sufficient to rebut the necessity of a preliminary injunction, the Court now extends its temporary restraining order by fourteen days to allow Respondent to show cause as to the feasibility and implementation of such precautions.

## II. Legal Standard

In determining whether to grant a preliminary injunction, courts evaluate four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury absent an injunction; 3) whether granting the injunction would cause substantial harm to others; and 4) whether the public interest would be served by granting the injunction. *Northeast Ohio Coal. For Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467

4

F.3d 999, 1009 (6th Cir. 2006). These four factors "are not prerequisites that must be met but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id.* (internal quotations omitted). "[P]reliminary injunctions are extraordinary and drastic remedies [] never awarded as of right." *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015).

In the alternative, a court may extend a temporary restraining order for good cause. Federal Rule of Civil Procedure 65(b)(2) provides that a temporary restraining order "expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record." Accordingly, if the Court finds good cause, it may extend the temporary restraining order for up to fourteen days.

The Court finds that determining the feasibility of additional precautionary measures and allowing Respondent to implement them constitutes good cause for extending the temporary restraining order.

5

### III.  Analysis

The Court granted emergency injunctive relief because, based on the Court's initial review of the record, Petitioner had shown: a high likelihood of irreparable injury absent an injunction, both in the form of substantial risk to his health and life from COVID-19 and due to his alleged constitutional violations (ECF No. 9, PageID.668–673); a strong likelihood of success on the merits with respect to both the objective and subjective components of a deliberate indifference claim (*Id.* at PageID.673–676); and that the balance of equities and public interest favored his immediate release (*Id.* at PageID.676–678). Specifically,  the Court found that "[t]he evidence strongly suggests that release is the only justifiable option consistent with public health principles." (ECF No. 9, PageID.673.)

Respondent Adducci now argues that 1) because there has not been a confirmed case of COVID-19 among detainees at the Calhoun County Correctional Facility, Petitioner cannot show that irreparable injury is imminent, rendering injunctive relief inappropriate (ECF No. 10, PageID.696); 2) Petitioner cannot demonstrated a likelihood of success on the merits because he cannot show that Respondent has been

6

deliberately indifferent "given the comprehensive measures that ICE and staff at Calhoun have taken to prevent the introduction and potential spread of COVID-19" (*Id.* at PageID.698); and 3) the public interest favors denying injunctive relief because Petitioner is both a danger to the community and a flight risk (*Id.* at PageID.705).

Since the Court first addressed the COVID-19 pandemic as it pertains to the constitutionality of continued detention at the Calhoun County Correctional Facility, *see Malam v. Adducci,* Case No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 6, 2020), Respondent has taken important steps at the CCCF to reduce the risk of infection to detainees and staff alike. Additionally, Respondent persuasively argues that the public interest favors Petitioner's continued detention in light of his significant criminal history. Accordingly, the Court finds that the implementation of additional precautions would warrant denying a preliminary injunction.

## A. Testing of all staff and detainees is needed to confirm that there are no cases of COVID-19 at the Calhoun County Correctional Facility and to protect Petitioner from a high risk of infection.

Respondent insists that Petitioner cannot demonstrate a risk of irreparable injury unless and until there is a confirmed case of COVID-19 at the Calhoun County Correctional Facility. However, unless and until the Calhoun County Correctional Facility tests all staff and detainees, the risk of irreparable injury to Petitioner will remain high.

Respondent cites to *Helling v. Mckinney* for the proposition that Petitioner only faces irreparable injury if that injury is "sufficiently imminent." (ECF No. 10, PageID.693 (citing 509 U.S. 25, 33-34 (1993).) In *Helling*, a prisoner challenged, on Eighth Amendment grounds, his involuntary exposure to secondhand smoke from a cellmate who smoked cigarettes. 509 U.S. at 28. The Court, in finding the prisoner to have properly stated a claim for relief, held that "[w]e have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33.

Respondent would read *Helling* narrowly:

The salient point in *Helling* as it relates to asserting claims based on communicable diseases like COVID-19, is that inmates can challenge "exposure" to a disease even if they may not have actually contracted it. *Helling*, 509 U.S. at 33.

8

> *Helling* does not stand for the proposition that detainees can challenge the potential that they may be exposed, as Zaya asserts. Nor does *Helling* suggest that a detainee can challenge potential exposure that would differ little from the exposure if released into the general public.

(ECF No. 10, PageID.693.) But Respondent's narrow reading is not supported by *Helling* itself.

The *Helling* Court cited favorably to *Gates v. Collier*, a Fifth Circuit opinion addressing when the risk of future injury was sufficient to state an Eighth Amendment claim. 509 U.S. at 34. In *Gates*, the court held that a prison's insufficient inventory of firefighting equipment constituted an Eighth Amendment violation. 501 F.2d 1291 (5th Cir. 1974). The court noted that "[a]t most camps there is a lack of adequate firefighting equipment making it, as stated by the Penitentiary Superintendent, 'almost impossible to put out a fire at [the detention facility] with the present water system and the present fire-fighting equipment.'" 501 F.2d 1291, 1301 (5th Cir. 1974). It would verge on the absurd to suggest that a prisoner would have needed to wait for a fire to break out in the facility prior to being able to allege irreparable injury. Instead, the *Gates* court recognized that the risk of fire itself was enough.

So too here. COVID-19 does not respect prison walls. The raging
global pandemic outside of Calhoun County Correctional Facility poses a
serious risk to those inside.

The number COVID-19 cases in detention facilities—both ICE and
otherwise—nationwide demonstrates the stark reality that communal
confinement, even with the precautions Respondent has employed,
creates a significant risk of COVID-19 infection. Although the serious
outbreak at the Cook County Jail—now recognized as the single greatest
source of COVID-19 infections in the United States, *see* Timothy
Williams & Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus
Spreads Behind Bars*, NY Times (Apr. 8, 2020),
nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html—
does not directly increase the risk to Petitioner, it shows how a pandemic
can sweep into communal detention environments despite precautionary
measures being taken prior to any confirmed cases. *See Sheriff Dart
Expands Precautionary Measures for COVID-19 at Cook County
Department of Corrections*, Cook County Sheriff's Office (Mar. 12, 2020),
https://www.cookcountysheriff.org/sheriff-dart-expands-
precautionarymeasures-for-covid-19-at-cook-county-department-of-

corrections (noting significant precautionary measures similar to those at Calhoun County Correctional Facility); *Update on Efforts to Reduce Population at Cook County Jail and Ongoing Precautions to Prevent COVID-19*, Cook County Sheriff's Office (Mar. 18, 2020), https://www.cookcountysheriff.org/update-on-efforts-to reducepopulation-at-cook-county-jail-and-ongoing-precautions-to-preventcovid-19 (noting expansion of precautionary measures). Despite precautionary measures, cases of COVID-19 among inmates in the Cook County Jail exploded from two to 167 in eight days. (ECF No. 29, PageID.635.) On April 1, 2020, the Rikers Island jail complex's chief physician acknowledged that "infections are soaring" despite the facility's "following Centers for Disease Control and Prevention guidelines and having moved mountains to protect our patients." Miranda Bryant, *Coronavirus Spread at Rikers is a 'Public Health Disaster', Says Jail's Top Doctor*, The Guardian (Apr. 1, 2020), https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jailcoronavirus-public-health-disaster. As of mid-April, the nationwide curve of COVID-19 infections among Federal Bureau of Prison inmates shows no sign of flattening, again despite significant precautionary

measures. *See* Walter Pavlo, *Federal Bureau of Prisons Institutions Not Showing Any Signs of "Flattening Curve,"* Forbes (Apr. 15, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/15/federal-bureau-ofprisons-institutions-not-showing-any-signs-of-flatteningcurve/#46f2999f54dd. ICE facilities have also seen a rise of COVID-19 cases despite the precautionary measures to which Respondent points: of the 705 total detainees tested as of April 28, 2020, 425 detainees across thirty-three detention facilities tested positive. *ICE Guidance on COVID-19*, United States Immigration and Customs Enforcement (last updated April 28, 2020), https://www.ice.gov/coronavirus. Thirty-six detention center employees have similarly tested positive. *Id.*

Additionally, COVID-19 can spread through asymptomatic transmission. Of the 3,277 inmates who tested positive for COVID-19 in Arkansas, North Carolina, Ohio and Virginia, ninety-six percent were asymptomatic. Linda So & Grant Smith, *In four U.S. state prisons, nearly 3,300 inmates test positive for coronavirus -- 96% without symptoms*, Reuters (Apr. 25, 2020), https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-u-s-state-prisons-nearly-3300-

inmates-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX.

These observations led the Court to hold in its April 18, 2020 order that "in the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a 'generalized risk' is a 'substantial risk' of catching the COVID-19 virus for any group of human beings in highly confined conditions, such as Petitioner within the CCCF facility." (ECF No. 10, PageID.668–669 (internal citations omitted).) Petitioner need not await an outbreak of COVID-19 at Calhoun County Correctional Facility in order for this Court to find that he faces a high risk of infection absent proper precautions.

The Court commends Respondent and ICE for taking what precautions they have, but without additional precautions, communal confinement for Petitioner under present conditions at the Calhoun County Correctional Facility creates a risk of exposure sufficient under *Helling* to state a claim and constitute irreparable injury. Respondent provides, in the declaration of James Jacobs, Assistant Field Office Director with the Detroit Field Office of Enforcement and Removal

Operations, a list of screening measures used by the Calhoun County Correctional Facility to prevent COVID-19's entry into the facility. (ECF No. 10-10, PageID.731.) These include:

- [D]uring intake medical screenings, detainees are assessed for fever and respiratory illness, their body temperature is taken, they are asked to confirm if they have had close contact with a person with laboratory-confirmed COVID-19 in the past 14 days, and whether they have traveled from or through area(s) with sustained community transmission in the past two weeks. (*Id.* at PageID.732.)

- Staff interacting with a symptomatic detainee are also required to wear personal protective equipment. (*Id.* at PageID.733.)

- Calhoun County is screening all staff and vendors when they enter the facility including body temperatures. In addition to being turned away, staff who screen positive are directed to their personal physician. (*Id.* at PageID.734.)

Public health evidence demonstrates that these screening measures, with an emphasis on symptoms, are insufficient to adequately reduce the risk of irreparable injury to detainees with a heightened risk of severe illness and death from COVID-19. Screening for symptoms will do nothing to prevent asymptomatic transmission. CDC testing priorities, on which Respondent relies, have expanded to encompass the

14

testing of all staff: the latest iteration of testing priorities includes "[p]ersons without symptoms who are prioritized by health departments or clinicians, for any reason, including but not limited to: public health monitoring, sentinel surveillance, or screening of other asymptomatic individuals according to state and local plans." *Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19),* Centers for Disease Control and Prevention (last updated Apr. 27, 2020), https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html. Here in Michigan, the Michigan Department of Health and Human Services prioritizes testing of all workers still reporting in person, regardless of whether they are displaying symptoms. *MDHHS Launches Large-scale, Volunteer Contact Tracing Effort; Expands Testing Criteria to Include Any Worker Still Reporting in Person*, Michigan.gov (Apr. 20, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98158-526523--,00.html. Petitioner's reasonable safety demands the testing of all Calhoun County Correctional Facility staff and detainees to ensure that there are in fact no infections within the detention center.

To date, ICE has only tested 995 detainees nationwide. *ICE Guidance on COVID-19*, U.S. Customs and Immigration Enforcement

(last updated Apr. 29, 2020). At the Calhoun County Correctional Facility, "only detainees that are displaying symptoms will be tested." (ECF No. 10-10, PageID.733.) In order for Respondent to sufficiently reduce the risk of irreparable injury to Petitioner—because of Petitioner's heightened risk of severe illness and death—Respondent, ICE, and the Calhoun County Correctional Facility would need to provide COVID-19 testing to all staff and detainees. Accordingly, Respondent is ordered to show cause, in writing of no more than ten pages, by May 7, 2020, as to whether testing of all staff and detainees is both feasible and in place at the Calhoun County Correctional Facility. Petitioner may respond, in writing of no more than ten pages, by May 11, 2020. The Court will extend the temporary restraining order by fourteen days to allow the Court to evaluate Respondent's response.

### B. Without mandatory masks for all detainees and staff and guaranteed individual housing for Petitioner, Petitioner could continue to show a likelihood of success on the merits.

Respondent's second argument—that although ICE has not taken as many precautions as it might have, it has done enough—pleads practicality, but it continues to fail constitutional scrutiny. The Supreme

Court held in *Farmer v. Brennan* that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. 825, 844 (1994). Key to this analysis is whether Respondent has acted reasonably. Although the Court notes that the precautions taken at the Calhoun County Correctional Facility are important, they do not yet go far enough to be a reasonable response to a global pandemic with respect to detainees at heightened risk of severe illness and death from COVID-19.

Respondent cites to *Brown v. Harris* for the proposition that the precautions taken at Calhoun County Correctional Facility do not need to eliminate all possibility of transmission in order to be deemed reasonable. 240 F.3d 383, 390 (4th Cir. 2001). But as *Brown* explained, "In determining the substantiality of the risk that [a respondent] knew, and the reasonableness of [their] response to it, we must consider everything that [they were] told and observed." At the time of this Court's first decision regarding civil detention in light of COVID-19, thirteen ICE detainees and seven detention center employees had tested positive. *Malam*, 2020 WL 1672662 at *7 (noting statistics as of April 4, 2020). As

17

of April 28, 2020, despite precautionary measures, 449 detainees and thirty-six detention center employees have tested positive. *ICE Guidance on COVID-19*, United States Immigration and Customs Enforcement (last updated April 28, 2020), Respondent has observed that the number of ICE detainees with COVID-19 has increased exponentially, with a doubling rate of approximately five days.

In response to this trend, Respondent has implemented a number of important precautionary measures at the Calhoun County Correctional Facility. In addition to the screening measures described above,

- Calhoun County provides education on COVID-19 to staff and detainees. (ECF No. 10-10, PageID.735.)

- Hand washing stations are available in all areas of the housing units, including within cells, for detainees to wash their hands. Detainees are issued and have continual access to bars of soap. A new bar of soap is provided upon request. The soap provided is antibacterial and in adequate supply. (*Id.*)

- Calhoun County provides staff with disinfectants, hand sanitizer, soap, masks, gloves, gowns, and eye protection. (*Id.*)

- All detainees have been educated on social distancing. (*Id.*)

18

In crafting this response, "Respondent tracked recommendations from the CDC, the nation's health protection agency" and "convened a working group between medical professionals, disease control specialists, detention experts, and field operators to identify additional enhanced steps to minimize the spread of the virus." (ECF No. 10, PageID.700.) And yet, according to Respondent, only "[t]hose detainees who present symptoms compatible with COVID-19 are required to wear a mask." (ECF No. 10-10, PageID.733.) Additionally, staff are "encouraged" but not required "to wear a cloth face mask at all times." (*Id.* at PageID.736.) "[M]any [but not all] detainees have cells to themselves." (*Id.*)

The Court finds that with respect to Petitioner, these precautions do not go far enough to constitute a reasonable response to COVID-19. CDC guidance for correctional facilities and ICE's Pandemic Response Requirements do not address specific precautionary measures for detainees with underlying health conditions, such as Petitioner. (ECF No. 7-2; ECF No. 7-5). CDC Guidance only recommends that "[i]f the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19." (ECF No. 7-2,

19

PageID.529.) And ICE guidance contemplates the release of high-risk detainees:

> "Upon being informed of a detainee who may potentially be at higher risk for serious illness from exposure to COVID-19, ERO will review the case to determine whether continued detention is appropriate. ICE will make such custody determinations on a case-by-case basis, pursuant to the applicable legal standards, with due consideration of the public health considerations implicated."

(ECF No. 7-5, PageID.562.) By contrast, each piece of public health evidence on which the Court relied in granting a temporary restraining order focused on the needs of detainees with heightened risk of severe illness and/or death. (ECF No. 9, PageID.669–673.)

In light of Petitioner's underlying health conditions, the public health evidence available, and the exponential growth of COVID-19 infections within ICE detention centers, a reasonable response would include, at minimum, the following additional precautions:

- Mandatory face masks for all detainees and staff

- Guaranteed individual housing for Petitioner should he return to CCCF

Accordingly, Respondent is ordered to show cause, in writing of no more than ten pages, by May 7, 2020, as to whether these precautionary

measures are both feasible and in place at the Calhoun County Correctional Facility. Petitioner may respond, in writing of no more than ten pages, by May 11, 2020. The Court will extend the temporary restraining order by fourteen days to allow the Court to evaluate Respondent's response.

### C. If the Calhoun County Correctional Facility can provide additional precautionary measures, the public interest would favor Petitioner's continued detention.

In granting a temporary restraining order, the Court noted that "Respondent does not argue that Petitioner would either be a danger to his community or a flight risk." (ECF No. 9, PageID.678.) Respondent now argues that Petitioner is both. (ECF No. 10, PageID.705.)

8 U.S.C. § 1231(a)(2) reflects Congress' intent that individuals with serious criminal histories be detained pending removal proceedings. As Respondent documents, Petitioner has a lengthy criminal history. Two of Petitioner's convictions, one for domestic violence and one for second-degree murder occurring during an armed robbery, involve violence. (ECF No. 10, PageID.684–685.) Additionally, "while in prison, [Petitioner] had multiple misconduct violations including several for

possession of stolen property, refusing to take a drug test, and threatening behavior." (*Id.* at PageID.685.)

Petitioner is also a flight risk. Respondent notes that Petitioner "has fled the state at least twice before to avoid conviction" and "has also failed to appear for a probation hearing resulting in a warrant for his arrest." (*Id.* at PageID.705.) Petitioner "has also violated probation several times, even while on a tether." (*Id.*)

Petitioner does not address these arguments in his reply. (ECF No. 11.) Accordingly, the Court finds that the public has an interest in Petitioner's continued detention because he is a danger to the community and a flight risk.

Nonetheless, the Court finds that public health provides a countervailing interest against which the Court must balance Petitioner's danger and risk of flight. Protecting public health and safety is in the public interest. See *Neinast v. Bd. Of Trustees*, 346 F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests).

The Court finds that absent testing, mandatory personal protective equipment, and individual housing for Petitioner, the public's interest in

22

public health in the midst of a global pandemic takes precedence over the public's interest in Petitioner's continued detention. Accordingly, Respondent is ordered to show cause, in writing of no more than ten pages, by May 7, 2020, whether each of the above precautionary measures is feasible and in place at the Calhoun County Correctional Facility. Petitioner may respond, in writing of no more than ten pages, by May 11, 2020. The Court will extend the temporary restraining order by fourteen days to allow the Court to evaluate Respondent's response.

## IV.   Conclusion

For the reasons stated above, the Court **EXTENDS** its April 18, 2020 temporary restraining order by fourteen days. The temporary restraining order will expire at 6:30PM EST on May 14, 2020.

Respondent is **ORDERED** to show cause, in writing of no more than ten pages, by May 7, 2020, as to whether the following precautionary measures are feasible and have been implemented at the Calhoun County Correctional facility: 1) COVID-19 testing of all staff and detainees; 2) mandatory personal protective equipment in the form of masks for all staff and detainees; and 3) guaranteed individual housing

for Petitioner. Petitioner may respond, in writing of no more than ten pages, by May 11, 2020.

IT IS SO ORDERED.

Dated: April 30, 2020          s/Judith E. Levy
Ann Arbor, Michigan           JUDITH E. LEVY
                              United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 30, 2020.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager

24